OPINION OF THE COURT
Jasen, J.
Presented for our review on this appeal is the issue whether the Board of Regents, through the Commissioner of Education, has the power to deny registration of doctoral degree programs offered by the State University of New York on the ground that they do not satisfy academic standards prescribed by the commissioner.
Appellants, the Chancellor and Trustees of the State University of New York and certain professors and doctoral students in the History and English Departments of the State University of New York at Albany, commenced this action seeking a declaration that the Trustees of the State University constitute the body charged with the operation of university programs, courses and curricula, thus invalidating the directive of the commissioner denying registration of doctoral programs in history and English, as made in excess of his powers. Special Term granted summary judgment to respondents, the Board of Regents and the Commissioner of Education, holding that respondents do possess the power to review academic programs offered by the State University to determine whether such programs should be registered. Insofar as Special Term viewed appellants’ action as an article 78 proceeding to review the determination of the commissioner denying registration of appellants’ programs, the court concluded that, as to the history program, judicial review was barred by the Statute of Limitations. (CPLR 217.) Although finding appellants’ proceeding timely as to the English program, Special Term nonetheless concluded that there existed a rational basis for the commissioner’s determination. On appeal, the Appellate Division unanimously affirmed. Before this court, appellants do not raise the rationality of the commissioner’s determination, but, rather, limit their challenge to the power of respondents to require registration of programs offered by the State University.
We hold that the Education Law does empower the Board of Regents, acting through the Commissioner of Education, to require registration of doctoral degree programs offered by the State University and to deny registration to those programs it determines to be academically deficient.
*598 To place the current dispute between the Regents and the State University in proper perspective, a brief review of the historical evolution of these bodies is appropriate. When first created by the Legislature, the Regents of the University of the State of New York succeeded to the powers of the governors of Kings College, which was then renamed Columbia College. (L 1784, ch 51.) This grant of power endowed the Regents with full authority to govern and manage any college established in New York, all such institutions to be deemed part of the University of New York. (Id.) Subsequently, however, the Legislature altered the role of the Regents by granting to a board of trustees of Columbia College autonomous control over the operation of the college. (L 1787, ch 82.) Concomitantly, this act endowed all colleges established in New York with the same rights and privileges vested in the trustees of Columbia College. (Id.) As a result, the Regents underwent a metamorphosis, the effect of which was to clothe it with a broad policy-making function over higher education in New York, leaving the day-to-day operation of the colleges to their own governing bodies. (See Carmichael, New York Establishes a State University 2 [1955].)
With the advent of the State University of New York (L 1948, ch 695 [Education Law, § 352]), however, the Regents became enmeshed in the day-to-day operation of this semi-independent educational corporation. To alter this governing structure, the Legislature subsequently vested in the Board of Trustees of the State University the same power to administer the day-to-day operations of the State University as trustees of private institutions of higher education had been granted. (L 1961, ch 388.) Viewed in this historical perspective, the issue in the instant case can be framed as whether the Regents, as a policy-making body, possesses the power to require registration of doctoral degree programs or whether control over the offering of such programs lies within the ambit of the Trustees of the State University.
At the outset, we note that a critical function of the Regents is its preparation, once every four years, of a master plan "for the development and expansion of higher education” in New York. (Education Law, § 237, subd 1.) This plan includes public as well as private institutions. The 1972 master plan, prepared by the Regents, and approved by the Governor, recognized the need for strengthening graduate programs and recommended that "institutions should withdraw those programs which, *599 upon evaluation, prove to be (a) inactive or underenrolled, (b) of marginal quality and which cannot be strengthened by sharing resources with other institutions, and (c) below the minimum standards set by Commissioner’s Regulations.” Separate and apart from the policy recommendations concerning graduate programs contained in the 1972 master plan, section 210 of the Education Law specifically gives the Regents the power to "register domestic and foreign institutions in terms of New York standards”.
It is true that read literally section 210 speaks only of the registration of domestic and foreign institutions and is silent as to the registration of particular programs offered by such institutions. However, we do not believe the power of registration granted to the Regents need be construed so narrowly. Section 210 must not be read in isolation, but with an awareness of the full range of powers granted to the Regents. Particularly significant in this regard is the power of visitation provided in section 215 of the Education Law. This section authorizes the Regents or the Commissioner of Education to "visit, examine into and inspect, any institution in the university” and to "require, as often as desired, duly verified reports therefrom giving such information and in such form as the regents or the commissioner of education shall prescribe.” In the event that an institution violates "any law or any rule of the university”, the Regents is empowered to "suspend the charter or any of the rights and privileges of such institution.”
We see no reason why sections 210 and 215 should not be read together as the statutory authority for the power of the Regents to require registration of doctoral degree programs offered by institutions of higher education in New York. If the Regents, in the first instance, has the power to register institutions "in terms of New York standards” (Education Law, § 210), and the power to suspend the rights and privileges of an institution violating "any rule or law of the university” (Education Law, § 215), it would not appear unreasonable to conclude that the Regents also possesses the power to deny the registration of doctoral degree programs which it believes do not conform with standards set for institutions of higher education. Of course, the standards for registration set by the Regents must not be arbitrary or capricious, either in the abstract or in application to specific programs. To hold that the Regents is empowered to require registration of *600 doctoral degree programs is not to insulate such administrative action from judicial scrutiny.
Of critical importance to the effectuation of the Regents’ powers is the legislative function with which it has been endowed: that is, to determine the educational policies of the State and to "establish rules for carrying into effect the laws and policies of the state, relating to education, and the functions, powers, duties and trusts conferred or charged upon the university and the education department.” (Education Law, § 207.) Implementing this power, the Regents, based upon the policy recommendations made in the 1972 master plan, established a rule providing the Commissioner of Education with authority to promulgate regulations governing the registration of courses of study in colleges, as well as in professional, technical and other schools. (8 NYCRR 13.1 [a].) Acting upon this mandate, the commissioner promulgated a regulation requiring the registration of "[e]very curriculum creditable toward a degree offered by institutions of higher education” (8 NYCRR 52.1 [a] [l]).[1]
To effectuate this registration requirement, the commissioner also promulgated a regulation setting forth standards to be employed in the determination whether to grant or deny the registration of degree programs offered by all institutions of higher education, both private and public. (8 NYCRR 52.2.) This regulation provided, inter alia, that "[e]ach member of the academic staff shall have demonstrated by his training, earned degrees, scholarship, experience, and by classroom performance or other evidence of teaching potential, his competence to offer the courses and discharge the other academic responsibilities which are assigned to him.” (8 NYCRR 52.2 [c].)
In reviewing the qualifications of the faculty of the English and History Departments at the State University of New York at Albany to offer doctoral programs, the commissioner, based upon reports submitted by the site visitation team and program evaluation committee, as well as upon the recommendation of the doctoral council[2], determined that the faculty in *601 these departments were not sufficiently productive or prominent to support a doctoral program and, therefore, declined to register the programs. Indicia of faculty productivity or prominence relied upon by the commissioner focused upon the extent of research and publications credited to members of the faculty of the doctoral programs evaluated. Concerning the history program, the report of the visitation team concluded that the department was not widely known and that "[w]ith one outstanding exception * * * the members of the department, individually and collectively [did] not represent the kind of prominent scholars to whom one refers undergraduates in all parts of the country for graduate training.” Similarly, the report of the visitation team evaluating the English program concluded "that in general the members of the department are not recognized nationally by appointment to national honorary bodies, MLA committees, or editorial boards.”
 In concluding that the Commissioner of Education did not act in excess of his powers in denying registration of these programs based upon this criteria, we reject, at the outset, appellant’s contention that the power of the Regents is limited pursuant to chapter 388 of the Laws of 1961 to supervision and approval of the State University Trustees’ master plan. The purpose of that legislation was not to exempt the State University from the authority of the Regents. On the contrary, the Legislature sought merely to place the State University on the same footing as private institutions of higher education in New York: that is to grant the trustees of the State University the same power to govern the day-to-day operations of the State University as trustees of private institutions possessed. It was intended to have, and in fact had, no effect on the broad policy-making function exercised by the Regents over both private and public institutions of higher education in New York.
In exercising this function, the Regents recommended in its 1972 master plan the withdrawal of academically deficient programs. Moreover, as previously discussed, sections 210 and 215 of the Education Law must be interpreted to empower the Regents to register degree programs as well as the institutions themselves in terms of New York standards. These standards, *602 promulgated as regulations by the Commissioner of Education (8 NYCRR 52.2), provide the necessary authority for the commissioner’s determination to deny the registration of the English and history doctoral programs offered by the State University of New York at Albany.
We also reject appellants’ contention that standards for the registration of educational programs were never promulgated. This argument is premised upon the conclusion that the standards employed in the determination of the commissioner to deny registration were those contained in position paper 19, a document published by the Regents recommending the evaluation of all doctoral programs in the State to ensure that only programs of high academic caliber be continued. We would agree that the recommendations contained in position paper 19 did not, upon publication, acquire the status of regulations promulgated by the Commissioner of Education. But that is not to say that the recommendations made in position paper 19 could not have been considered by the commissioner in his determination to deny registration in the present case, together with the essential standards contained in the regulation which he had promulgated. (See 8 NYCRR 52.2.)
As a word of caution we add that the power of the Regents is not unbridled. Its function is one of an overseer: a body possessed of broad policy-making attributes. In its broadest sense, the purpose of the Regents is "to encourage and promote education” (Education Law, § 201), a purpose which must be realized only through the powers granted to the Regents by the Legislature. (NY Const, art XI, § 2.) In the absence of a specific grant of power by the Legislature (see, e.g., Education Law, § 210 [to register domestic and foreign institutions]; § 215 [to examine, inspect and visit institutions and to require their submission of reports]), the Regents cannot transform section 207 of the Education Law, the fountainhead of the Regents’ rule-making power, into an all-encompassing power permitting the Regents’ intervention in the day-to-day operations of the institutions of higher education in New York. Were this provision interpreted otherwise, it would run afoul of the constitutional prohibition (NY Const, art III, § 1), against the Legislature’s delegation of lawmaking power to other bodies. (See Matter of Levine v Whalen, 39 NY2d 510, 515; Matter of Mooney v Cohen, 272 NY 33, 37.) In view, however, of the specific powers granted by the Legisla *603 ture to the Regents previously discussed, we believe that, in the present case, section 207 operates as a means for the effectuation of independent powers, rather than as their source.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Breitel and Judges Gabrielli, Wachtler, Fuchsberg and Cooke concur; Judge Jones taking no part. Order affirmed.

. Pursuant to this regulation, approximately 13,000 degree and certificate programs, over 2,000 of which were offered by the State University, have been registered by the Department of Education.

. In addition to reviewing the report of the evaluation committee, the doctoral council, a body composed of 14 leaders of graduate education in New York, two each from the State University and the City University of New York and 10 from private *601 institutions, conducted a meeting attended by representatives of the State University and of the State University at Albany at which representatives of the latter submitted statements in support of the history and English doctoral programs being reviewed.